**United States District Court**
**Eastern District of Michigan**
**Southern Division**

The United States of America,                         Criminal No. 21-cr-20354

                          Plaintiff,                         Hon. Paul D. Borman

v.

D-24 Brandon Thomas,

                          Defendant.

—————————————————/

### Government's Appeal of Magistrate Judge's Order of Release

Brandon Thomas is a high-ranking Chief Enforcer for the violent Almighty Vice Lord Nation ("AVLN") gang and an armed fentanyl trafficker, facing a presumption of detention. Thomas is the self-admitted third-in-command in the Insane Vice Lord ("IVL") branch, who follows IVL Prince D-1 Kevin Fordham's orders. Murder is—in Thomas's own words—part of his "business."

In March 2021, Thomas discussed murdering another AVLN member, "Lil Ugly," with D-1 Kevin Fordham at the request of an IVL member. Thomas casually stated that he does not "mind taking care of business, you know that[.]" He later told Fordham, "If you want me, if you want me to go handle this right now. I'll go do it right now[.]" During the same call, Thomas discussed participating in a shooting to assist another AVLN member in trouble simply because he was a Vice Lord.

Thomas's business also includes drugs, like heroin and fentanyl, and guns. Thomas sold heroin that tested positive as fentanyl. At the time of his arrest, he

possessed approximately 700 grams of suspected heroin, 800 grams of suspected marijuana, a 12-gauge shotgun, a 9mm handgun, drug-packaging materials, and assorted ammunition in one residence, and a Glock pistol, magazine, and ammunition in another residence.  But he does not confine his guns to his house. Thomas posted photos of guns to social media, including these in a car:



The post depicts an assault rifle with a high-capacity drum magazine with a magnified optic, laser combination affixed for accuracy, and an AR-style pistol, with the caption, "Work work."

He also has a 12-year history of failing to appear, including nine outstanding failure-to-appear warrants as recent as 2020.

Because Thomas is a danger to the community and a flight risk, the government appealed the Magistrate Judge's order of release of Brandon Thomas, which the court stayed for 24 hours. (ECF No. 194, PageID.514). In this *de novo* review—and with the benefit of a full slate of facts—this Court should detain him.

## I.    Factual Background

### *Facts from the proffer before the magistrate judge*

The United States relies on its factual proffer during the October 5, 2020 detention hearing, which is detailed below. This proffer included (1) a written proffer (ECF No. 85: Written Proffer in Support of Mot. for Det.); (2) the Pretrial Services Report; (3) evidence of Thomas's involvement in the AVLN; (4) evidence of Thomas's drug trafficking including a controlled buy on March 25, 2021; and (5) facts surrounding Thomas's arrest and two federal search warrants at Thomas's residences. *See* (Ex. 1: Transcript).

Specifically, the government focused on several facts from the written proffer that relate to Thomas and his participation in the AVLN. The AVLN is a highly organized, violent gang adhering to strict by-laws and a chain-of-command structure. (ECF No. 85: Written Proffer, PageID.266-70). Vice Lord members must follow orders from higher-ranked leaders. (*Id.* at PageID.268). AVLN literature requires that members must "never deny [an] order from [a] superior officer of this nation. You

3

will carry it out immediately[.]" (*Id.*).  This includes orders to commit violent acts like murder. (*Id.*).

Vice Lords promote a climate of fear through violence and threats of violence. Gang members are strictly prohibited from speaking with outsiders about the Vice Lords or from cooperating with law enforcement.  Vice Lords kill members suspected of cooperating with law enforcement.  *See* (*id.* at PageID.270-74).  They also have a long memory and do not forget when gang members cooperate with law enforcement. (*Id.* at PageID.273).  On May 27, 2015, AVLN members fired 23 shots into the home of V.T. and S.T., two former Vice Lords whom AVLN members believe cooperated with federal law enforcement.  During the shooting, several bullets injured V.T., and S.T., as well as their family members, T.T.-1 and T.T.-2—mere centimeters made the difference between a quadruple homicide and the victims' eventual survival of the shooting.  Nearly four years later—after a federal prosecution for AVLN members involved in the May 2015 shooting—AVLN members continued to discuss plans to murder the suspected cooperators.

Current power struggles within AVLN leadership also present significant danger for violent retaliation.  Under AVLN law, treason is punishable by "no less than a life of misery or Death."  (*Id.* at PageID.275).  Leaders within the Mafia Insane Vice Lords ("MIVLs"), with the support of the Traveling Vice Lords ("TVLs"), planned to overthrow IVL Prince D-1 Kevin Fordham and those underneath his leadership.  While plotting to kill Fordham, AVLN members specifically mentioned

4

Brandon Thomas as someone to kill first because he was one of the IVL members that they needed to worry about when carrying out this plan.

Vice Lords also possess and share firearms to protect themselves and other AVLN members.  Under AVLN law, gang members are required to protect and defend AVLN members, which includes retaliation for any violence carried out against an AVLN member.  (*Id.* at PageID.279).   AVLN literature requires, "If One Member Fights, We All Fight."  (*Id.*).  Specifically, "it is the unspoken obligation of every VL [Vice Lord] to defend himself [and] every other VL to the extent of giving their life[,] if necessary" and "[i]f any VL is attacked[,] it is the sworn duty of every VL to overcome his attacker by whatever means necessary."  (*Id.*).

Gang members are required to "aid and assist" other AVLN members.  (*Id.*). Specifically, Law #1 of the AVLN's Supreme Constitutional Laws provides, "[a]t any time a member is in trouble, in danger, or need of assistance, you are to assist them, whether they are right or wrong[,] to the best of your ability[.]" (*Id.* at PageID.279-80). And Law #14 provides, "A Vice Lord must act as a solider for the [Almighty Vice Lord] Nation to the point of his/her death."  (*Id.*)  This includes carrying and using firearms to protect themselves and other AVLN members.  (*Id.*)  During a March 23, 2021 call, Brandon Thomas told D-1 Kevin Fordham about how he was involved in a shooting to protect another IVL member.  (*Id.* at PageID.280).  Specifically, Thomas explained that an AVLN member called him because he was getting followed by someone, so Thomas said he had to catch up with them, and then "let loose on the

n------." Confirming his allegiance to the AVLN, Thomas then stated, "You know I'm a come, I'm a come and ride, I'm a come and ride for you cause you a Vice Lord[.]"

The AVLN also participates in drug trafficking involving fentanyl, cocaine, cocaine base, heroin, ecstasy/MDMA, methamphetamine, prescription pills, and marijuana. (*Id.* at PageID.280). Based on their involvement in the gang, AVLN members enjoy connections to drug suppliers and utilize an interstate network to facilitate drug trafficking. (*Id.*).

The Pretrial Services Report lacks significant, relevant information for the Court to consider when determining whether Thomas is a non-appearance risk or a danger if released on bond. Thomas and his girlfriend told Pretrial Services that they lived at the Vaughan address for the past year, but this information was not truthful. Based on location information from Thomas's phone, ATF surveillance, and Thomas's own post-arrest admissions, he split his time evenly between the Vaughan address, with his girlfriend and several children, and an address on Brady in Redford, Michigan, where his nephew lives. Thomas's location information also showed that he left the state on May 16, 2021. Agents arrested Thomas on June 3, 2021 at the Vaughan address, but his location information showed that Thomas slept at the Brady address the day before his arrest. Thomas claims to be self-employed as a security guard since 2011. Thomas also has a mental health history, including a hospitalization

five years ago for hearing voices, and currently is taking medication for a mood disorder and a psychotropic medication.

Over the last decade, Thomas has a history of failing to appear for court proceedings and has ten active warrants, nearly all of which are for failure to appear. From 2009 through 2020, Thomas has nine active failure-to-appear warrants, with the latest from November 17, 2020. Thomas has a limited criminal history. He has a 2006 misdemeanor conviction for reckless use of a firearm. He also has 2008 arrests for felony stolen vehicle and misdemeanor obstruction. He was also arrested in 2013 for felony criminal sexual conduct, assault with intent to commit great bodily harm, and assault with a dangerous weapon, all of which were eventually dismissed. The police report from that arrest details that Thomas thought that the victim had molested his girlfriend's child. The victim stated that Thomas threatened him with a steak knife, shoved a metal broom up his rectum, and threatened to cut off his genitals with garden shears.

### *Additional facts not in the pretrial services report or recommendation*

The following proffered facts, in addition to the written proffer, were not included in the Pretrial Services Report or its recommendation for release.

Thomas is referenced by name in ten overt acts in the Indictment. *See* (R. 1: Indictment, PageID.47, 87, 101, 103, 105-06, 110, 112). Thomas is the Chief Enforcer for the IVL branch. (*Id.* at PageID.22). AVLN literature provides that Chief Enforcers are expected to handle discipline and enforce all commands sent

down from AVLN leaders, including acts of violence like assaults and murder. Thomas is also the national President for the Phantom's Motorcycle Club, which is a motorcycle gang affiliated with the AVLN. (*Id.*). It was also recognized as a criminal enterprise in a federal racketeering case in this district, which this Court presided over, in *United States v. Nicholson*, Case No. 13-20764. During a recorded call on April 19, 2021, Brandon Thomas explained that he is the "Chief Enforcer over the Nation, right under 'P' [an unindicted coconspirator]." (*Id.* at PageID.112). Based on the investigation, as well as Thomas's own admission, he is the third highest ranked IVL member, just underneath D-1 Kevin Fordham and "P."

In 2018, Thomas and two AVLN members attempted to extort K.M. for his money and his motorcycle. *See (id.* at PageID.47). K.M. told police that, through text messages and in person, Thomas and an AVLN member attempted to extort K.M. for $2,000 and his motorcycle because an AVLN member suspected that K.M. was having an affair with his wife. When K.M. denied owning a motorcycle, Thomas threatened K.M.'s life and his family if Thomas ever saw K.M. riding a motorcycle. On March 19, 2018, the police report states that, Thomas and two AVLN members attempted to steal K.M.'s motorcycle from his home, but K.M. confronted them in the driveway. During the confrontation, Thomas and the two AVLN members attempted to kidnap K.M. At one point, Thomas stated that he had a firearm in the back of the truck and went back toward the truck. This vehicle was registered to "Boss Hogg Protection." "Boss Hogg" is Thomas's gang alias. During the

8

confrontation, Thomas also told an AVLN member to leave the motorcycle because they could take K.M. instead, and an AVLN member threatened K.M.'s life and his family. Fearing for his safety, K.M. fired a gun from his right pocket, which killed an AVLN member.

Additionally, from February 5, 2021 through April 30, 2021, Thomas engaged in numerous phone conversations with IVL Prince D-1 Kevin Fordham about AVLN business. On March 13, 2021, Thomas spoke with Fordham about an IVL member's request for Fordham to issue a kill order against another AVLN member known as "Lil Ugly." During the call, Thomas repeatedly expressed his willingness to kill "Lil Ugly" if Fordham ordered the murder. The following is a partial transcript[1] of the call:

| | |
|---|---|
| FORDHAM: | Yeah um, you going, you, **you going to take care of that situation? You know what I'm talking 'bout.** |
| THOMAS: | Man, it's a--it sound faulty to me man. Know what I'm saying even "P" say it sound faulty man with what's going on. Know what I'm saying, we got to talk about it. We got them two together and talk about it too. |
| FORDHAM: | Yeah. |
| THOMAS: | Something ain't adding up bro. **You know I don't mind, I don't mind taking care of business. You know that.** |
| FORDHAM: | Right, right. |
| THOMAS: | Yeah, so we got to figure out what's going on. |
| FORDHAM: | Right. |
| THOMAS: | Something ain't, something ain't adding up bro. Know what I'm saying? Just trying to get to the bottom of it. I understand brodie got fucked up in the midst of it. You know what I'm saying? **He** |

---

[1] All transcripts referred to in this document are initial, not final, drafts of the intercepted communications.

|  | still get his violation for that, but we need figure out, 'cause somebody going to fuck around get tooken (sic) out of here. |
|---|---|
| FORDHAM: | Yeah. Yeah, no doubt. |

[later in conversation]

| THOMAS: | **If you want me, if you want me to go handle this right now. I'll go do it right now,** but [IVL member in background] we got to figure it out. |
|---|---|
| FORDHAM: | [Addresses IVL member requesting kill order in the background] Look, look, look, my problem is, when I be trying to the [U/I]. Look how I'm suppose to (sic) do something and I don't even know what's going on. |
| THOMAS: | Well tell her, tell her to take care of it then, bro, shit. [Voices overlap] |
| FORDHAM: | I don't know what's going on. Listen I need--[IVL member in background]. **My job as Vice Lord is to figure out what's going on between the situations.** [IVL member in background] Oh, you [U/I] now. **Look, I'm on the fucking phone, and you talking 'bout some (sic) kill somebody and all that shit.** Come on now. [Voice in the background] |

[later in conversation]

| FORDHAM: | That's some--exactly. That's what I'm saying. [Voices overlap] |
|---|---|
| THOMAS: | **What point a finger and say go kill him,** and don't what's going on. |
| FORDHAM: | Right. That's what I'm talking 'bout. |

[later in conversation]

| FORDHAM: | Right. |
|---|---|
| THOMAS: | Nah, fuck that bro. **We going to get to the bottom of it. Man, ain't nobody going to jail.** Fucking around man, we don't know what's going on bro. [Voices overlap] |
| FORDHAM: | Right. [U/I] that's, that's, that's the reason why I came over here to see what was going on. To see what was going--hold on, hold bro. [No audio] [U/I] but she was doing something. So, I'm like okay well he going to take care of it. [Voices overlap] |
| THOMAS: | [U/I] I came up to the hospital. |
| FORDHAM: | Yeah. |

| THOMAS: | I came up to the hospital. Then I talked to "P." **"P" told me to hold on for a minute, let me get to the bottom of bro.** |
|---|---|
| FORDHAM: | Right, right. |
| THOMAS: | **I'll take care of it. I ain't got no issue with that.** |
| FORDHAM: | **Bro, I already know you will**. Already know. So, I'm [U/I] trying to figure out what's going. [Voices overlap] |
| THOMAS: | **Let me know [U/I] what you want me to do.** |

If an AVLN member violates AVLN law, he or she is subject to disciplinary actions. (ECF No. 85, PageID.269).  The AVLN imposes punishment upon members, generally referred to as "violations," which can include physical beatings. (*Id.*). Some violations, like acts of treason or cooperating with law enforcement, are punishable by death.  (*Id.*).  A Chief Enforcer, like Brandon Thomas, is responsible for overseeing and carrying out these violations.  For example, during an April 30, 2021 call, Thomas discussed violating AVLN members, along with the help of enforcers beneath Thomas, with D-1 Kevin Fordham.  The following is a partial transcript of that call.

| FORDHAM: | This Ghetti bro. |
|---|---|
| THOMAS: | What's goin' on bro? |
| FORDHAM: | What up doe? What's [STAMMERS] all of them, all of the mother fuckers at the meetin' for? They don't supposed to be there. |
| THOMAS: | Who? |
| FORDHAM: | Uh, Sleeze Ball, uh, Fouche. |
| THOMAS: | **I called them there, I called them for me man, it's my** [STAMMERS] **enforcers bro.** |
| FORDHAM: | Bro, listen, you uh, **you the Chief Enforcer, those guys is not needed unless it's a, it's, it's somethin' that need to be handled and you call them niggas and y'all gonna handle the shit.** |
| THOMAS: | **Oh, you don't think it's gonna be a violation today bro?** What's wrong wit (sic) you? |
| FORDHAM: | No, what I'm sayin, if it's gonna be violations if it's gonna be vi... |
[VOICES OVERLAP]

THOMAS:         Of course.

FORDHAM:        **Listen but if it's gonna be violation handed out, the sisters supposed to violate the sisters bro,** you know that so you don't even need them, they don't even need to be there and Fouche...

[VOICES OVERLAP]

THOMAS:         Man, what's the issue bro?

FORDHAM:        Huh?

THOMAS:         What's the issue bro?

[VOICES OVERLAP]

FORDHAM:        I don't, [PAUSE] I don't know what the issue is, I'm tryin'a tell...

[VOICES OVERLAP]

THOMAS:         Okay but I'm [STAMMERS], I'ma tell you I'ma handle it bro, I called the meetin'...

FORDHAM:        Bro why, but, okay but bro listen, listen bro!

[VOICES OVERLAP]

THOMAS:         . . .**I'ma handle that bro** but what's the issue?

FORDHAM:        You keep sayin' what's the issue, I'm tryin'a tell you. **Bro that ain't the way that's conducted, they, they, they're not supposed to be there, you the Chief Enforcer of the meetin', you was there for that, for that one cause, you don't need them brothers [male AVLN members] there, they ain't finna' violate none of the sisters [female AVLN members].**

[VOICES OVERLAP]

FORDHAM:        And then Fouche, and then... You keep sayin; bro you're not listenin' to me bro, you're not listenin' to me! And then Fouche don't even supposed to be there period!

THOMAS:         Okay, I'ma tell him to leave then.

FORDHAM:        Yeah, yeah, they [STAMMERS] [U/I], them sisters, **whatever charges would come up, make sure you should read them charges bro, 'cause if they ain't right, then don't violate nobody, but if they right or they got some, they in proper channels, then you do what you do.**

THOMAS:         A'ight, I [CHUCKLES]...

[VOICES OVERLAP]

FORDHAM:        'Cause you know they...

[VOICES OVERLAP]

THOMAS:         [U/I] y'all know what I'm doin' man [LAUGHS.]

FORDHAM:        Huh?

THOMAS:         **You act like I don't know what I'm doin' man.**

FORDHAM:        **I ain't said you don't bro, I know, that's why you in the position.**

12

[VOICES OVERLAP]
THOMAS:           **I don't think you do man. Right. I'ma take care of it, bro**.
[VOICES OVERLAP]
FORDHAM:          I'm just sayin', you know how them, you know how they be in
                  their feelins (sic) and shit, them sisters so, you know.
THOMAS:           **Yeah, that's why I called it, everybody everywhere.**

Thomas has also posted photos of firearms on his social media pages.  In

addition to the post above, Thomas also posted a photo of a firearm on February 6,

2021.



On February 23, 2021, Thomas posted a photo of himself with a firearm, and

two other men, one also holding a firearm.  The photo is captioned, "Yeah n---- we

laying like that brothers you know we missing a couple you fuck with one don't think

the others ain't coming tell you that now   You might as well just leave us the fuck

alone because we stay in our own lane and we don't fuck with no body."



Brandon Thomas is also an armed fentanyl trafficker who travels out of state to obtain drugs. On March 24, 2021, Thomas arranged to sell heroin the following day at his Brady residence. Although Thomas agreed to sell heroin, on March 25, 2021, after the controlled drug buy, lab analysis confirmed that Thomas actually sold approximately 32 grams of fentanyl. (ECF No. 1, PageID.105).

On June 3, 2021, ATF agents executed federal search warrants at Thomas's two residences; one on Vaughan in Detroit, Michigan (where Thomas requests to return to if given bond), and one on Brady in Redford, Michigan. At his Vaughan residence,

14

agents arrested Thomas, and seized a semi-automatic pistol, ammunition, and a magazine.  At his Brady residence, upstairs, agents seized a biker vest, a gun box with a firearm receipt and two magazines, "National Laws" paperwork, a 12-gauge shotgun, a 9mm handgun, a bag with drug-packaging material, a digital scale, approximately 700 grams of suspected heroin, approximately 800 grams of suspected marijuana, and 9mm and 12-gauge ammunition.  During a post-*Miranda* interview, Thomas admitted to ATF agents that he slept upstairs at the Brady residence and had stayed there the day before the search warrant.

After defense counsel's proffer and argument, the Magistrate Judge, noting Thomas's history of non-appearance and dangerousness, ordered Thomas released on an unsecured bond with the condition of home incarceration and named his girlfriend as his third-party custodian.  The government requested a 24-hour stay of the release order, pending appeal under 18 U.S.C. § 3145, which the court granted.  The government now appeals the release order.

## II.    Argument

### A.  Standard

Under § 3145, this Court reviews a magistrate judge's pretrial order *de novo.  See United States v. Yamini*, 91 F. Supp. 2d 1125, 1128-29 (S.D. Ohio Feb. 24, 2000) (collecting cases).

The United States moves for detention under § 3142(f)(1)(C), because the charges involve a drug offense punishable by 10 years or more, and under

§ 3142(f)(1)(E), because the offense involves the possession of a firearm.  The

government seeks detention on non-appearance and dangerousness grounds.

There is a statutory presumption of detention, 18 U.S.C. § 3142(e)(3)(A), which

Thomas may rebut if he "comes forward with evidence that he does not pose a

danger to the community or a risk of flight." *United States v. Stone*, 608 F.3d 939, 945

(6th Cir. 2010).  Once a defendant satisfies his burden of production, "the

presumption favoring detention does not disappear entirely, but remains a factor to be

considered among those weighed by the district court." *Id.* (internal citation omitted).

"The presumption remains a factor because it is not simply an evidentiary tool

designed for the courts.  Instead, the presumption reflects Congress's substantive

judgment that particular classes of offenders should ordinarily be detained prior to

trial." *Id.* "To rebut the presumption, therefore, a defendant should present all the

special features of his case that take it outside the congressional paradigm." *Id.* at 946

(internal citations and quotations omitted).

In addition to the presumption of detention, the Court must consider the

following factors: (1) the nature and circumstances of the offense; (2) the weight of

the evidence as it relates to dangerousness and risk of flight; (3) the defendant's

history and characteristics, and (4) the nature and seriousness of the danger to any

person or the community that would be posed by the person's release.  18 U.S.C.

§ 3142(g).

**B. Thomas, a Chief Enforcer for the AVLN and an armed fentanyl and heroin trafficker, is a danger to the community.**

Thomas is charged with a racketeering conspiracy and a drug-trafficking conspiracy, which involves fentanyl, heroin, and other controlled substances. *See* (ECF No. 1: Indictment, PageID.1-122, 126-30). Drug trafficking is a dangerous offense. But there is more to Thomas's dangerousness because of the gang element. "In dealing with the danger to the community or other person concept, the courts look to more than whether or not defendant himself has been guilty of physical violence[.]" *United States v. Vance*, 851 F.2d 166, 169 (6th Cir. 1988). "[T]he concept of a defendant's dangerousness as used in the [Bail Reform] Act is to be given a broader construction than merely danger of harm involving physical violence. Congress was apparently concerned with the safety not only of a particular identifiable individual, perhaps a victim or witness, but also of the community as a whole." *Id.* (internal citations and quotes omitted). The AVLN is dangerous as an enterprise and the Court is not required to ignore this fact. *See, e.g., United States v. Billingsley*, 682 F. App'x 681, 683 (10th Cir. 2017) ("[W]e are not convinced that the district court should ignore evidence about the group as a whole. It is important context that this DTO is intensely feared.").

Thomas not only engaged in armed drug trafficking but worked as a high-ranked Chief Enforcer for the AVLN. Thomas is the "muscle" for IVL Prince D-1 Kevin Fordham—the person who Fordham trusts to enforce kill orders and physical beatings for Vice Lords in violation of AVLN law. When Fordham discussed an

order to kill "Lil Ugly," Thomas repeatedly expressed his willingness to kill the member if Fordham gave the order.  During the call, Thomas casually told Fordham that, "I'll take care of it.  I ain't got no issue with that."  And Fordham responded, "Bro, I already know you will.  Already know."  Thomas's nonchalance when discussing a murder, particularly one where he is not personally involved nor does he believe that they have the full facts of what happened, demonstrates his willingness to engage in violence, including murder, if directed to do so by a Vice Lord leader. During the conversation about killing "Lil Ugly," Thomas's cavalier attitude while talking about committing a cold-blooded murder underscores his dangerousness to the safety of the community and the need for pretrial detention.

There are also significant witness-safety concerns.  The Vice Lords have a long and documented history of attempting to kill and killing members suspected of cooperating with law enforcement.  And Thomas has already shown a willingness to engage in violence, including murder, without any sort of personal involvement in the matter.  The danger that Thomas poses as a defendant in a large racketeering indictment is even greater now.  As IVL Prince D-1 Kevin Fordham explained during the April 30, 2021 call, Thomas knows what is doing, and "that's why [he's] in the [Chief Enforcer] position."

The ongoing power struggles within the AVLN further exacerbate Thomas's danger to the community.  MIVL and TVL members directly targeted Thomas, along with Fordham, to kill and overthrow.  Under AVLN law, treason is punishable by a

"life of misery or Death."  Now that the indictment is unsealed, Fordham and

Thomas are aware of this murder plot.  Thomas has already shown a willingness to

repeatedly shoot at an individual to protect another Vice Lord.  Based on the

proffered facts, Thomas is likely to engage in the same behavior, or to order a lower-

ranked Vice Lord to retaliate against these members who violated AVLN law.  The

April 30, 2021 call shows that Thomas is responsible for disciplining members who

violate AVLN law, and treason is one of the most extreme violations of AVLN law,

along with cooperating with law enforcement—both of which are punishable by

death.  Thomas also has a history of possessing firearms, including assault rifles and

shotguns, since 2018, and recently possessed three firearms between his two

residences, including two firearms in furtherance of his drug trafficking.

Thomas also has several enforcers beneath him, including D-26 Winisford

Watkins (*Id.*, PageID.87) and other unindicted coconspirators.  These enforcers are

likewise required, under AVLN law, to carry out any orders that Thomas issues,

including orders for violence.  The April 30, 2021 call shows that these enforcers are

willing to show up to meetings and engage in violence, if Thomas orders.  Even on

home incarceration, Thomas could order enforcers beneath him to engage in violence.

To add to this dangerousness, Thomas is also an armed fentanyl and heroin

trafficker.  He is charged with a controlled-substance offense, which is a factor under

§ 3142(g)(1).  The Sixth Circuit "routinely affirms, on dangerousness grounds, the pre-

trial detention of run-of-the-mill drug dealers, even without any indication that the

19

defendant has engaged in violence." *Stone*, 608 F.3d at 947 n.6; *see also United States v. Gray*, 20 F. App'x 473 (6th Cir. 2001) (in conspiracy to possess with intent to distribute cocaine, testimony from family members was insufficient to overcome the presumption of detention). But Thomas is far more than your average drug dealer—he is a high-ranking gang member who sells fentanyl and heroin, and possesses firearms to protect his drug trafficking.

Indeed, Thomas knowingly sells fentanyl. During recorded calls in April 2021, Thomas discussed how he needed to get more heroin and only has fentanyl available for sale. *See* (ECF No. 1: Indictment, PageID.110). Thomas also discussed traveling out of state to purchase more heroin. (*Id.*). Thomas also sells fentanyl disguised as heroin. During the March 25, 2021 controlled drug sale, Thomas arranged to sell heroin, but lab analysis confirmed that substance was actually fentanyl. Fentanyl is an incredibly dangerous and addictive opioid, linked with numerous overdose deaths each year. During the federal search warrant at his Brady residence, agents recovered approximately 700 grams of suspected heroin—enough to trigger a five-year mandatory minimum—approximately 800 grams of marijuana, a shotgun, a handgun, ammunition for both guns, and drug-packaging material. His recent firearms possession ties directly to his drug trafficking.

Thomas's possession of a firearm triggers is also a specified factor in the Act. *See* 18 U.S.C. § 3142(g)(3)(B). And the Sixth Circuit has upheld the pretrial detention of defendants on dangerousness grounds based in part on weapons found in the

defendants' homes. *See United States v. Abboud*, 42 Fed. App'x 784, 784 (6th Cir. 2002) (emphasizing that "[a] search of the defendant's home and business revealed guns, one of which was loaded," when affirming the district court's pretrial detention order); *United States v. Ramsey*, 110 F.3d 65 (table), 1997 WL 135443, at *1 (6th Cir. Mar. 24, 1997) (holding that the district court did not err in ordering the defendant's detention pending trial in part because defendant "has had access to firearms[.]")

In addition, if convicted of the drug-trafficking conspiracy, Thomas is facing a mandatory sentence of at least ten years in prison, *see* 21 U.S.C. § 841(b)(1)(A), which further reflects the serious nature of his drug-trafficking crime. *See, e.g., Baldwin v. N.Y.*, 399 U.S. 66, 68 (1970) ("In deciding whether an offense is 'petty,' we have sought objective criteria reflecting the seriousness with which society regards the offense . . . and we have found the most relevant such criteria in the severity of the maximum authorized penalty."). Based on his arrest and federal search warrants, he is also facing additional possible charges, including possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c), which carries a consecutive five-year mandatory sentence, as well as drug-trafficking charges. Thus, the nature and circumstances of the offense weigh heavily in favor of detention.

Relatedly, this shows that Thomas is a danger to the community and others, another factor that the Court must consider under § 3142(g). Thomas has shown that he is a faithful soldier of the AVLN who adheres to the gang's strict by-laws. He was involved in a shooting to protect another Vice Lord, he is willing to murder another

person if ordered by a Vice Lord leader, and he oversees and carries out assaults for Vice Lords in violation of these strict by-laws.  AVLN law requires death for members suspected of cooperating with law enforcement, and "a life of misery or Death" for those involved in treason.  There are significant concerns that Thomas will engage in violence or order lower-ranked members, like his group of "enforcers," to engage in violence against those suspected of cooperating with law enforcement or those involved in the treason plot to kill Thomas and IVL Prince D-1 Kevin Fordham.  If Thomas issues a violent order, these members cannot refuse.

Additionally, there is strong evidence of Thomas's involvement in a drug-trafficking conspiracy involving heroin, fentanyl, and other controlled substances. "To be sure, drug trafficking is a serious offense that, in itself, poses a danger to the community." *Stone*, 608 F.3d at 947, n. 6; *see also United States v. Leon*, 766 F. 2d 77, 81 (2d Cir. 1985) ("the harm to society caused by narcotics trafficking is encompassed within Congress's definition of 'danger'")).  Not only is Thomas involved in drug trafficking, he possesses a firearm to further his drug trafficking.  Thomas is an armed drug dealing who sells heroin and fentanyl.  Trafficking fentanyl alone is incredibly dangerous.  And drug trafficking while possessing firearms is even more dangerous. Therefore, this factor supports detention.

The weight of the evidence likewise supports detention.  The weight of the evidence "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948.  "[S]trong evidence against a

person . . . could increase the likelihood of danger to the community because they could believe that they are more likely to be incarcerated in the future, causing them to be more likely to engage in dangerous behavior." *United States v. Rice*, No. 3:04CR-83-R, 2006 WL 1687749, at *2 (W.D. Ky. June 19, 2006). As discussed above, the weight of the evidence against Thomas is strong, which makes it more likely that he will engage in dangerous behavior.

Although Thomas lacks a lengthy or violent criminal history, his history and characteristics support detention. This factor includes the defendant's character, physical and mental condition, family ties, employment, financial resources, length of time in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings. 18 U.S.C. § 3142(g)(3)(A). Thomas maintains that he is self-employed as a security guard, which is consistent with his role as a Chief Enforcer for the AVLN. It is likewise consistent with K.M.'s account of Thomas's involvement in extortion on behalf of an AVLN member who suspected K.M. of having an affair with his wife. Thomas and his girlfriend were also untruthful to Pretrial Services about his residence. His location data for the month of May shows that Thomas evenly split his nights between sleeping at the Vaughan address and the Brady address. Further, most of the proffered facts occurred while Thomas told Pretrial Services that he was living with his girlfriend, who is now pregnant. Therefore, there is clear and

23

convincing evidence that no release conditions will reasonably assure the safety of the community.

Thomas cannot overcome the presumption of detention. Thomas is the type of offender that, in Congress's "substantive judgment . . . should ordinarily be detained prior to trial." *Stone*, 608 F.3d at 945. Thomas does not present "special features" that take his case "outside the congressional paradigm." *Id.* at 946. Even if Thomas rebutted the presumption of detention, it is a factor that weighs heavily in favor of detention.

Electronic monitoring is not enough. *See United States v. Johnson*, No. 20-cr-20278, 2020 WL 4812719, at *6 (E.D. Mich. Aug. 19, 2020) (Drain, J.) ("While electronic monitoring is available for qualifying defendants, the Court questions how Pretrial Services can effectively monitor Defendant's possession of loaded firearms, ammunition, drugs, and drug-packaging materials while inside his residence. Further, the Court questions the adequacy of Defendant's proposed release plan, specifically one . . . where five minor children reside."). The circumstances surrounding Thomas's arrest are similar to those in *Johnson*. At his Brady residence, Thomas possessed approximately 700 grams of suspected heroin, 800 grams of marijuana, drug packaging materials, and two firearms. This is the same location where his nephew lives.

Likewise, home incarceration does not prevent Thomas from ordering lower-ranked members to engage in violence, which they are required to perform. As

discussed above, Thomas has authority to issue kill orders for members suspected of cooperating with law enforcement or engaged in treason.  And he can issue these orders from the comforts of his home.  Therefore, this condition does not adequately protect the community from the danger Thomas poses if released.

Additionally, Thomas's pregnant girlfriend cannot prevent Thomas from ordering violence, from selling drugs, or unlawfully possessing firearms.  *Cf. United States v. Wood*, No. 19-20216, 2020 WL 4791205, at *2 (E.D. Mich. Aug. 17, 2020) (Parker, J.) (proffered third-party custodian does not allay the Court's concerns about the risk of danger to the community if released); *Stone*, 608 F.3d 939, 947 (6th Cir. 2010) (discussing how a third-party custodian, among other evidence, focuses mainly on potential risk of flight rather than dangerousness with respect to a defendant's burden of production); *United States v. Mercedes*, 254 F.3d 433, 437 (2d Cir. 2001) (electronic monitoring, home detention, and assurances by defendant's fiancée of his compliance are insufficient in face of strong evidence that defendant charged with conspiracy to commit armed robbery of drug-dealer is a danger to the community and flight risk).  Thomas claims that he has been living at Vaughan with his girlfriend for the last year, along with several children.  During that time, Thomas has also engaged in violence, expressed a willingness to commit murder, sold fentanyl, and possessed firearms.  Further, based on Thomas's own admissions to law enforcement and his location information, Thomas's girlfriend was not truthful to Pretrial Services about where Thomas was living.  The Court does not have adequate assurance that she will

report any violations or have any ability to stop Thomas from engaging in or ordering

violence.

### C. Thomas has a demonstrated history of failing to appear, and is a flight risk.

No conditions will reasonably assure Thomas's appearance as required.  The

best predictor of Thomas's future appearance is his past behavior.  His history

confirms that he poses a significant non-appearance risk.  Since 2009, Thomas has

collected nine failure-to-appear warrants, all of which remain active.  The most recent

is from November 17, 2020, while he claims he was living with his girlfriend on

Vaughan.  His incentive to fail to appear is much greater here, where he faces a

mandatory ten-year sentence for the drug-trafficking conspiracy count alone.  This

sentence is also much longer than any he has served, further incentivizing non-

appearance.  And the weight of the evidence against Thomas is strong—Thomas is

involved in a controlled drug buy involving fentanyl, and is captured on recorded calls

discussing selling heroin and fentanyl, AVLN business, murder, involvement in a

shooting, and handing out physical violations.  Plus, during a search warrant, agents

recovered suspected heroin, marijuana, drug-packaging materials, and two firearms—

all of which increases his risk of flight.  *Rice*, 2006 WL 1687749, at *2.  ("[W]hen

considering the weight of the evidence against the person, the judicial officer is to

consider how the weight of the evidence would affect the person's dangerousness or

risk of flight—for example, strong evidence against a person could increase their risk

of flight because they are likely to be convicted[.]"). Thus, the nature and circumstances of the offense, including the mandatory-minimum sentence, and Thomas's history of non-appearance, demonstrate by a preponderance of the evidence that there are no conditions or combinations of conditions that will reasonably assure Thomas's appearance as required, so the Court should detain Thomas.

### III.   Conclusion

Because of Thomas's dangerousness and non-appearance risk, the Court should order Thomas detained pending trial.

Respectfully Submitted,

Saima S. Mohsin
Acting United States Attorney

*/s Danielle Asher*
Danielle Asher
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226-3211
(313) 226-9518
danielle.asher@usdoj.gov

Date: June 10, 2021

## **Certificate of Service**

I hereby certify that on June 10, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification to the attorney of record.

*/s Danielle Asher*
Danielle Asher
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226-3211
(313) 226-9518
danielle.asher@usdoj.gov